

**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

**ENTERED**

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_[Signature]_

**Signed July 1, 2009**                                              **United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| HALLWOOD ENERGY, L.P., | § | CASE NO. 09-31253-11 |
| a Delaware Limited Partnership, | § | |
| et. al. | § § | |
| | § | **JOINTLY ADMINISTERED** |
| Debtors. | § § § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER GRANTING MOTION OF HALL PHOENIX/ INWOOD, LTD. FOR RELIEF FROM THE AUTOMATIC STAY

The following constitutes the Court's findings of fact, conclusions of law, and ruling in connection with the Motion for Relief from Automatic Stay filed by secured creditor Hall Phoenix/Inwood, Ltd. (hereinafter, "HPI"). The court reserves the right to amend or supplement these findings and conclusions. These findings and conclusions are entered in support of the Court's Order Granting Motion of Hall Phoenix/Inwood, Ltd. for Relief from Automatic Stay.

1. The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

2. The Debtors filed their Chapter 11 bankruptcy petitions on March 1, 2009. The Debtors are six related entities engaged in the acquisition and exploitation of mostly gas shale formations in West Texas, Arkansas, and Louisiana. Specifically, the Debtors are part of an independent energy group based in Dallas, Texas, whose most recent operations have focused on unconventional gas resources in West Texas and on conventional and unconventional resources in Central Eastern Arkansas. The Debtors own oil and gas leases covering thousands of acres in the Fayetteville Shale and the Penn Sand formations of the Arkoma Basin in Arkansas, and substantially less acreage in the Delaware Basin in West Texas.

3. The Debtors were formed in December 2005 (although there were prior Hallwood companies involving some of the same principals before that). Since the Debtors' inception in late 2005, the Debtors have lost between $500 million and $600 million. The Debtors' problems have been largely caused by lack of drilling success, and were exacerbated by the significant drop in prices of natural gas and oil since the summer of 2008. The credible evidence at the two-day hearing on this matter also suggested that the Debtors' general and administrative expenses have perhaps historically been larger than justified for an exploration and production company of the Debtors' size, and the Debtors' lease operating expenses have also been somewhat high — perhaps at least in part because of the nonconventional and untested gas resources it has tried to exploit.

4. The Debtors' four-month case has been highly contentious. The Debtors are now down to just two officers, plus an interim Chief Restructuring Officer, Mr. James Latimer, whose engagement will expire on June 30, 2009. Almost every motion in the case has been opposed by multiple parties. The Court ordered mediation in this case, in June, among the major constituencies: i.e., the Debtors; HPI; the Debtors' parent company, The Hallwood Group,

Incorporated; FEI Shale, who is a party to a so-called Farmout Agreement with the Debtors and invested approximately $100 million in exchange for assignments of part of the Debtors' assets; and the Unsecured Creditors Committee. Such mediation did, indeed, occur in mid-June, but it did not bear much fruit. Only the Unsecured Creditors Committee and HPI reached agreements, although shortly after the mediation, the Debtors and their parent company reached certain agreements for the parent to loan approximately $1 million to the Debtors and also to pay another $3.2 million to the Debtors, in exchange for releases of certain claims against the parent. Notably, such agreement between the Debtors and their parent is not supported by HPI or the Unsecured Creditors Committee (as they believe the claims the estate has against the parent are much greater).

5. HPI, the movant, is the Debtors' secured lender with a lien on essentially all of the Debtors' assets except for a so-called Project Account that currently holds just over $3 million (a major portion of which Project Account will soon be turned over to FEI Shale, the Debtors' farmout partner, pursuant to another order of the Court). HPI produced credible evidence in support of its Motion for Relief from Stay showing that it is owed over $118 million, by virtue of a $100 million note and credit agreement entered into April 19, 2007, which was secured by a first lien on all the Debtors' assets except the Project Account; and also by virtue of a $15 million second lien note and credit agreement entered into in January 2008. The Debtors are in default on these notes and have not made any payments on them since February 2009.

6. In addition to HPI, over $6 million in mechanics and materialmen's liens have been asserted against the Debtors' assets and tens of millions of unsecured claims are asserted against the Debtors.

7. HPI argues that the Debtors have no equity in their properties (the "Properties") and the Properties are not necessary to an effective reorganization; therefore, the court should grant HPI relief from the automatic stay pursuant to Section 362(d)(2) of the Bankruptcy Code to exercise their state law and contractual rights with regard to the properties. HPI also argues that there is "cause" to lift the stay with respect to the Debtors' Properties, in that HPI is not adequately protected, as set forth in Section 362(d)(1) of the Bankruptcy Code.

8. Pursuant to Bankruptcy Code Section 362(g), HPI has the burden of proof on the issue of the Debtors' equity in the Properties. The Debtor has the burden of proof on all other issues—such as whether the Properties are necessary to an effective reorganization as well as on the issue of whether it is adequately protecting HPI.

9. The Court finds that the Debtors have no equity in their Properties. Equity is, of course, the difference between asset value and the debt encumbering such assets. With regard to asset value, the Debtors have taken the position that their assets have a value of between $28.1 million and $38.2 million. HPI Exhibit 13. The Debtors' Schedules filed in their cases suggest more value than this, when adding up the real property interests of the Debtors, and the value of the Debtors' gathering systems including tubular inventory such as pipe and casing, etc, and when adding in the Debtors' cash and claims against the Debtors' parent, etc. But even using the scheduled value of assets, it is clear that the Debtors have no equity in their Property. The Debtors do not really dispute this. In other words, the Debtors now admit that their real property interests simply do not have the value that was once so optimistically touted as probable or achievable in letters sent to investors back in 2007.

10. Since the Court has found that the credible evidence is that HPI is owed more than $118 million, the Court concludes that there is no equity for the Debtors in their properties.

11. With regard to the next question of whether the Debtors' property as to which HPI seeks stay relief is necessary to an effective reorganization, it is undisputed that the Debtors will be unable to reorganize without the Properties. However, the Properties must be "essential for an effective reorganization that is in prospect." *United Sav. Ass'n v. Timbers of Inwood Forest Associates*, 484 U.S. 365, 376 (1988). ("This means . . . there must be 'a reasonable possibility of a successful reorganization within a reasonable time.'") *Id*. "However honest in its efforts the debtor may be, and however, sincere its motives, the [Court] is not bound to clog its docket with visionary or impracticable schemes for resuscitation." *First Jersey Nat'l Bank. v. Brown (In re Brown)*, 951 F.2d 564, 572 (3rd Cir. 1991) (quoting *Tennessee Publishing Co. v. American Nat'l Bank*, 299 U.S. 18, 22 (1936)). "In essence '[c]ourts usually require the debtor do more than manifest unsubstantiated hopes for a successful reorganization.'" *In re Canal Place Ltd. Partnership,* 921 F.2d at 577; see also *In re Brown*, 951 F.2d at 572 (quoting the Fifth Circuit in *In re Canal Place Ltd. Partnership*). The *Timbers* case mandated that bankruptcy courts "evaluate the reorganization profile of the debtor in order to determine whether there was a reasonable prospect for a successful reorganization within a reasonable time," such as reviewing the debtor's assets, the claims against the debtor, the debtor's plan of reorganization, and the debtor's history prior to the bankruptcy proceeding.

12. Here, while this case is not terribly old (only 4 months old), we have a Debtor soon running out of cash—unless the Court approves a debtor-in-possession loan from The Hallwood Group and a settlement with The Hallwood Group—both of which are vehemently opposed. Additionally, the Debtors' plan of reorganization on file, filed May 21, 2009 (HPI Exhibit 8), is premised on equitably subordinating HPI. The Debtors testified that they will file an amended plan soon, but the Debtors did not say whether they would change the equitable

subordination feature of the plan. The Plan also contemplates the Debtors raising $25 million in equity for the formation of a new limited partnership to be known as Hallwood Penn Partners, L.P. There were no commitments for the $25 million as of the hearing on the motion for relief from stay; only some indications of interest from existing equity holders (only one of whom testified) and one newcomer.

13. The Court finds that there is no reasonable possibility of a successful reorganization within a reasonable amount of time. This is largely due to the fact that the equitable subordination adversary proceeding, on which the Debtors' plan is premised, appears to be a terribly weak case. As noted at trial, this Court was not adjudicating the equitable subordination suit in the contested matter of the motion for relief from stay. But the Court was faced with "assessing" somewhat the equitable subordination theories and deciding if they created a "show stopper" with respect to HPI's attempts to get the stay lifted immediately.

14. The equitable subordination suit is premised on such things as the "insiderness" of HPI (since its principals, Don Braun and Craig Hall, were directors of the Debtors until April 13, 2007 - just before HPI's first loan was made); also alleged are control and overreaching by Craig Hall and Don Braun; also alleged are breaches of fiduciary duties by them in suggesting that their company, HPI, become the new lender to the Debtors in place of J. Aron/Goldman Sachs; it is also alleged that it is problematic that HPI ultimately earned a big interest "spread" on its loans to the Debtors; additionally, undercapitalization of the Debtors is alleged; and finally, more generally, the fact that HPI is all up and down the Debtors' capital structure here (as first and second lien holder; unsecured debt holder; and significant equity holder) is suggested as problematic.

15. First, certainly, there must be more than simply "insiderness" or closeness of a lender in order to subordinate a loan. There must be inequitable conduct that results in harm to the debtor or confers an unfair advantage on the lender. Examples would be a fiduciary misusing his position to the disadvantage of other creditors of the debtor or controlling the debtor to the disadvantage of other creditors, or a lender actually defrauding other creditors. Undercapitalization can be a significant factor leading to equitable subordination, but there still must be some sort of inequitable conduct by the lender.

16. Here, after hearing eight witnesses over two days, the Court cannot find that there is a colorable claim of inequitable conduct on the part of Hall, Braun and HPI. While it is true that Hall and Braun were directors of the Debtor right up until almost the time of the HPI loan, they were but two of seven directors and did not participate in the board of directors' approval of the HPI loan. There is no credible evidence of control or overreaching. There is no credible evidence of threats or coercion or abuse of position. The credible evidence was that the HPI loan was nearly identical to the J. Aron/Goldman Sachs loan made to the Debtors, except for being more favorable to the Debtors in key respects—namely by providing the Debtors more funding, extending the maturity date, and pushing significantly out into the future the Debtors' time to comply with a certain reserves-to-loan-balance covenant. The evidence was that in December 2006, the Debtors were on the verge of a covenant default with Goldman Sachs, and paid a $400,000 fee to extend the loan through March 2007. However, in March 2007, the Debtors were on the verge of a covenant default again, and were likely going to face this scenario a third time in the near future with the Goldman Sachs loan if the Debtors stayed with that lender. The credible evidence was that it made sense and was a good thing for the Debtors to replace Goldman Sachs with HPI. The Court cannot find that the Debtors were harmed when the terms

of the HPI loan were more favorable to the Debtors than the Goldman Sachs loan. The Court cannot find that Hall and Braun were overreaching or acting to the disadvantage of the Debtors or their other creditors just because HPI was earning a profit on the spread between what HPI was paying in interest to Texas Capital Bank or Plains Capital Bank versus what the Debtors were paying in interest to HPI. Goldman Sachs also, no doubt, was making a profit on an interest spread—this is how lenders make money. Moreover, the credible evidence was that Anthony Gumbiner and other principals of the Debtors knew HPI was depending on a lending relationship with Texas Capital Bank and Plains Capital Bank to help it make its loans to the Debtors. Moreover, it cannot be ignored that Texas Capital and Plains Capital required other significant credit enhancements from HPI that the Debtors were not in a position to give a traditional lender—these traditional financial institutions (Texas Capital Bank and Plains Capital Bank) were looking to the creditworthiness and additional collateral of HPI as a borrower (whom Texas Capital and Plains Capital no doubt considered more favorable and deserving of a lower interest rate than a borrower such as Hallwood would merit). The evidence was that HPI had to pledge an office park and either the assets or stock of a software company in connection with its loans from Texas Capital and/or Plains Capital. The credible evidence was that Hallwood was not the type of borrower that could get a traditional financial institution to loan money to it. The Court cannot find any of this scenario to be sinister or bad faith, or that a breach of duties suggesting equitable subordination of HPI's loans to the Debtors is warranted. Notably, the testimony of Anthony Gumbiner was not at all supportive of the equitable subordination theories. He declined to embrace much of the strong language in the Debtors' equitable subordination complaint – suggesting no more than Hall had a strong personality and had influence on the Debtors because "he was the richest man in the room" and the Debtors needed his equity

contributions. Finally, not only can the Court not find bad conduct on the part of Hall and Braun and HPI, but the Court cannot find that undercapitalization passes the "smell test" here. The HPI loan involved more equity capitalization at the end of the day to the Debtors than the Goldman Sachs loan did — much of which HPI itself contributed.. And the Court notes that the Debtors themselves supplied solvency certificates at the time of the HPI loan suggesting that the Debtors were solvent and adequately capitalized. Finally, it is significant to the Court that the Debtors never hinted at this possible equitable subordination lawsuit or claims against Hall, Braun and HPI in any of its numerous SEC or other public disclosures.

17. So, in this Court's "assessment" of the equitable subordination lawsuit, the Court simply cannot find that it is a "show stopper" on giving HPI relief from the automatic stay. The Court cannot find that there was an unfair advantage extracted by HPI that harmed the creditors of the Debtors at the end of the day.

18. But there are other reasons besides the lack of the viability of the equitable subordination theories that the Court believes suggest that a reasonable chance of reorganization is not in prospect in a reasonable period of time. For one thing, the $25 million that the Debtors' plan contemplates for a capital infusion does not yet exist, and the Debtors had no witness who would commit to it. But in addition, the Court believes that the Debtors' estimates for the cost of the Penn Sand drilling are not reliable. The Debtors are estimating a cost to drill and complete these wells at $1.37 million each. This is significantly lower than the Debtors' history for well drilling and completion costs – even for the Wendell and Heffner wells that were drilled in the Penn Sands. The Debtors are also suggesting low lease operating expenses ("LOE") on these wells. And this is coming from a debtor with historically high LOE. The Court recognizes that there was testimony to support lower LOE in Penn Sands generally—such as lower rig rates and

the reduction or elimination of water hauling when one is drilling in sand. But the Debtors historically just do not have a great track record with keeping LOE low or with successful Arkansas wells generally (having drilled twenty-six or so, of which only three are commercial). This further suggests to the Court that the likelihood of a successful reorganization is not in prospect here.

19. So, returning to the Section 362(d) analysis, it seems clear to the Court that the Debtors have no prospect of an effective reorganization in a reasonable time. The Court does not see the equitable subordination suit as prevailing. Even if it does have a chance, it would take months or years to resolve (with no "Plan B" in the interim). Moreover, the Debtors have no commitments for the $25 million of funding the plan contemplates. The Debtors' predictions for costs on Penn Sands do not seem plausible. And, last but not least, the Debtors are faced with the realities of the market place. Gas prices are terribly low with no witness suggesting a likely imminent turnaround. On the contrary, there was credible testimony that other companies such as Chesapeake and other big exploration and production companies are shutting in their wells, at a very small cost, until prices go up (rather than depleting supply at such a low profit margin). The credible testimony suggested that the Debtors' Penn Project had potential, but was not without risk and probably made more sense in year 2010 with a different management team.

20. For all of these reasons, the Court finds that lifting the stay in favor of HPI is warranted under Section 362(d)(2).

21. Lastly, the court finds additional cause to lift the stay in favor of HPI is lack of adequate protection. The Debtors' assets are depleting. The Debtors have never been able to service HPI's debt through operations, but only from capitalization. There are credible health

and safety concerns that need to be addressed. Therefore, lack of adequate protection is additional cause to lift the stay under Section 362(d)(1).

22. The automatic stay is lifted to allow HPI to exercise its state law and contractual rights with respect to the Properties, including the right to operate the Properties pending foreclosure, the right to seize the Debtors' cash other than the Project Account, the right to post the Properties for foreclosure, and the right to otherwise take all actions precedent to obtaining title to the Properties. The Court accepts the agreement between HPI and the Unsecured Creditors Committee and shall incorporate the agreement into an order to be entered in conjunction with these findings and conclusions. Pursuant to that agreement, HPI shall not actually foreclose or take title to the Properties until after August 31, 2009.

23. Environmental and health and safety issues should be addressed promptly by the parties and the Court expects the cooperation of the parties with one another in this regard.

**SUBMITTED BY:**
Frank J. Wright
Paul B. Geilich
C. Ashley Ellis
**WRIGHT GINSBERG BRUSILOW P.C.**
600 Signature Place
14755 Preston Road
Dallas, TX 75254
(972) 788-1600
(972) 239-0138 (fax)
bankruptcy@hswgb.com

**ATTORNEYS FOR HALL PHOENIX/INWOOD, LTD.**

I:\7200s\7221\pleadings\MLS-HPI-FindingsandConclusions