including the authority to retain certain professionals and the joint administration of all the Debtors' cases under one case number.

      **5.2**    <u>Stay Litigation Commenced by HPI</u>.  On April 8, 2009, HPI filed a Motion for Relief from the Automatic Stay (the "Stay Motion"). In the Stay Motion, HPI argues that the Court should grant relief from the automatic stay under 11 U.S.C. § 362(d)(1) and/or (d)(2). HPI's arguments in the Stay Motion are that HPI is entitled to relief from the automatic stay "for cause" under §362(d)(1) because HPI's interests in the Debtors' assets are not adequately protected, the Debtors' post-petition cash position is continuing to deteriorate, and the Debtors' and related parties' actions immediately prior to the filing of these cases are indicative of bad faith. Alternatively, HPI also argues that HPI is entitled to relief from the automatic stay under § 362(d)(2) because the Debtors do not have any equity in the property securing HPI's loans, and such property is not necessary to an effective reorganization. In summary, HPI argues that the Debtors' indebtedness to HPI vastly exceeds the present value of the Debtors' assets upon which HPI has a lien, and the Debtors cannot move forward with a reorganization without HPI's consent. HPI's Stay Motion was set for a final hearing on June 25, 2009. After hearing the evidence, the Bankruptcy Court granted HPI's Stay Motion and lifted the stay to permit HPI to take all action necessary to post its collateral for foreclosure, to take immediate possession of its cash collateral, and to immediately assume control and management of the Debtors' assets. The Bankruptcy Court made extensive findings in connection with its order and found that the Debtors have no equity in their assets and that their was no validity to the Debtors' claims to subordinate the debt of HPI. (See Exhibit "B.")

      **5.3**    <u>Stay Litigation Commenced by FEI Shale</u>.  On April 13, 2009, FEI Shale filed a motion for relief from stay seeking termination of the Farmout Agreement, authority to take the funds remaining in the Project Account and to terminate Debtors as operator on the subject wells. The "swap" agreements between HPI and FEI Shale set forth in HPI's Plan are not materially impacted by whether the Court grants or denies FEI Shale's motion. The final hearing on FEI Shale's motion is set for June 26, 2009. Pursuant to an agreed order, the Bankruptcy Court lifted the stay to permit the termination of the Farmout Agreement and the transfer of the balance of the Project Account (less certain reserves) to FEI Shale. (See Exhibit "C.")

      **5.4**    <u>Global Mediation</u>.  On March 12, 2009, the Debtors filed a Motion for Administrative Scheduling Order seeking that the Court order the primary parties in these cases to mediation. The hearing on that motion was originally set for March 24, 2009, reset for April 16, 2009, and then the Court *sua sponte* granted the motion and ordered the primary parties to mediation. HPI was opposed to the mediation, believing that a forced mediation scenario was not likely to produce a settlement between HPI, the Debtors, and the other primary parties. The mediation occurred on June 10, 2009 among HPI, Debtors, Hallwood Group, FEI Shale and the Committee. The mediation did not produce a global settlement but did produce a settlement between HPI and the Committee which terms are incorporated in this Plan. A copy of the agreement is attached hereto as Exhibit "G."

# ARTICLE VI

## THE PLAN OF REORGANIZATION

The Plan Proponent believes that the Plan provides the best vehicle by which Holders of Allowed Unsecured Claims can maximize the recovery on their Allowed Claims. A copy of the Plan is attached as Exhibit "A." The Plan Proponent urges you to review carefully and then vote to accept the Plan.

### A. Summary of the Plan

For your convenience, the following is a summary of certain material terms of the Plan. *The Plan Proponent encourages you to read the Plan in its entirety*.

HPI is the largest creditor of the Debtors with Claims in excess of $118 million secured by Liens on substantially all of the Debtors' assets. The Bankruptcy Court has permitted HPI to take all action necessary to prepare to foreclose its Liens and take control of the Debtors' assets including the Debtors' oil and gas properties. The Debtors' remaining assets consist primarily of Causes of Action against various parties. HPI and the Committee have reached an agreement regarding the pursuit of the Causes of Action and the terms for treatment of Claims of Creditors, which terms are incorporated in this Plan. The essential terms of the Plan are as follows:

1. The formation of three trusts (Trust I, Trust II and Trust III) for the benefit of Creditors into which certain Causes of Action will be transferred so that such Causes of Action, including claims against the Debtors officers, directors and professionals and The Hallwood Group Incorporated can be pursued for the benefit of Creditors.

2. A settlement between the Debtors' Estates and HPI and its officers of all claims of the Debtors against such parties, including claims for subordination and breach of fiduciary duty. Under the terms of the settlement the litigation will be dismissed with prejudice and HPI will fulfill its obligations under the Plan including advancing the costs of operating the trusts, releasing its liens on certain Causes of Action and contributing HPI's Direct Claims to the Trust. HPI will also receive a conveyance of all of its Collateral except those Causes of Action transferred to Trust I.

3. Trade Creditors will receive the following preferred treatment as a result of the agreement reached between the Committee and HPI: from Trust I, the first $1,000,000 after payment of certain other Claims and administrative costs and then 10% of all Recoveries; from Trust II, 60% of all Recoveries after payment of administrative costs; and from Trust III, 100% of all Recoveries after repayment of any borrowings by Trust III and after payment of administrative costs.

4. Payment of 100% of Allowed Priority M&M Lien Claims as provided in the Plan.

The Trusts created under the Plan will be funded as follows: as to Trust I, to the extent necessary as determined by HPI, HPI and/or HPE have agreed to fund the costs to pursue Causes of

Action belonging to the Trust and any Allowed Claims required to be paid on the Effective Date; as to Trust II, HPI has agreed to fund $200,000 in costs of the Trust as requested by the Trustee; and as to Trust III, the Trustee of Trust III may borrow monies from Trust II to fund the costs of Trust III. These funding mechanisms, inclusive of the agreement to the $200,000 figure to be funded into Trust II, were heavily negotiated between counsel for HPI and counsel for the Committee at a Court-ordered mediation. The Committee, in its role as representative of these estates agreed to this funding and supports confirmation of the Plan and formation of the Trusts. The litigation intended to be brought by the various Trusts may be expensive. The costs of that various litigation will have an impact on the net amount of funds available to pay creditors. In addition to litigation costs, the Plan provides that the Trustee of Trust I shall reimburse HPI for any monies it has funded for the administration of the Trust, the pursuit of Causes of Action or HPI Direct Claims (whether incurred before or after formation of the Trust). HPI estimates that reimbursement to be in the range of $200-300,000. However, the reality is that unless the litigation is brought at all, and without HPI agreeing to fund that litigation to the extent set forth above, there is no chance for any recovery to creditors because these estates are hopelessly insolvent. It is not possible to predict whether the $200,000 to be funded into Trust II will be sufficient, or whether the Trustee will attempt to seek additional funding. No counsel has agreed to pursue any of the contemplated litigation on a contingency fee basis.

Under the Plan, HPE will obtain title to HPI's Collateral (except Causes of Action, which are being transferred to the Trusts, and any Collateral located in Mississippi or Louisiana or anywhere else to the extent specifically excluded by HPI or HPE which will remain in the respective Debtor entity subject to HPI's and/or HPE's Liens and the HPI Secured Lenders' Liens) free and clear of all Liens, Claims and encumbrances except HPI's Liens and except as otherwise provided in the Plan. The future operation of the wells and leases that comprise a portion of that Collateral is uncertain. HPI has only been in a position to investigate the status of the Debtors' operations for a matter of weeks. HPI has not yet determined which, if any, of the Debtors' drilling operations it will continue. However, as discussed in this Disclosure Statement and the Plan, creditors' claims are being paid not from the proceeds of future operations of any assets, but from the proceeds of litigation. Therefore, no detailed discussion of future operations of the Debtors' former assets is necessary in this Disclosure Statement.

### B. The Plan's Settlement Regarding HPI

The Plan effects a settlement of any claims of the Debtors against HPI, its affiliated entities, officers and directors, including but not limited to Mr. Craig Hall and Mr. Don Braun. Mr. Hall and Mr. Braun were directors of Hallwood Energy from December 2005 to April, 2007. The specific terms of the settlement are set forth in Section 6.01 of the Plan. As a result of the settlement, HPI will have an Allowed Secured Claim of $28 million and an Allowed Unsecured Claim of $90 million and all claims by the Debtors against HPI, Mr. Hall and Mr. Braun for equitable subordination and breach of duty will be dismissed and released. Hallwood Group claims that this Disclosure Statement is lacking in its discussion of the support and justification for the settlement and the releases of Mr. Hall and Mr. Braun. It is HPI's position that the claims against HPI, Mr. Hall and Mr. Braun have no value. To address Hallwood Group's objection that there should be additional discussion of the basis for HPI's position that these claims have no value, HPI would state as

follows: HPI's position is amply supported by the findings of fact and conclusions of law by the Bankruptcy Court which included that "the equitable subordination proceeding ... appears to be a terribly weak case," that "after hearing eight witnesses over two days, the Court cannot find that there is a colorable claim of inequitable conduct on the part of Hall, Braun and HPI," that there was "no credible evidence of control or overreaching," that there was "no credible evidence of threats or coercion or abuse of position," that when assessing the facts surrounding the loan HPI made to the Debtors "the Court cannot find any of this scenario to be sinister or in bad faith, or that a breach of duties suggesting equitable subordination of HPI's loans to the Debtors is warranted," and that "the Court cannot find that there was an unfair advantage extracted by HPI that harmed the creditors of the Debtors at the end of the day." Based on these express findings and others, the Bankruptcy Court granted HPI's stay motion. HGI has argued that Mr. Hall and Mr. Braun are not providing adequate consideration for the releases that they are proposed to receive under the Plan, particularly since they were formerly directors of Hallwood Energy at a time when the Debtors incurred losses. However, based on the above-referenced express findings of the Court and other facts and circumstances, HPI believes (and the Committee agrees, see Exhibit "G") that the settlement under the Plan with HPI which includes releases for Mr. Hall and Mr. Braun is more than sufficiently supported. The settlement also provides certain benefits to Creditors including the release of HPI's Liens on the Causes of Action, the transfer of HPI's Direct Claims to Trust I for benefit of all Creditors, the funding of Trusts I and II by HPI, and the preferential treatment of Trade Creditors as provided in the Plan.

### C. Committee and HPI Settlement

As a result of the global mediation ordered by the Bankruptcy Court, a settlement was reached between HPI and the Committee. (See Exhibit "G.") The agreement generally provides: (i) HPI will propose a plan containing the terms for treatment as set forth in the Plan; (ii) for certain provisions regarding payment of Committee's professional's fees; (iii) for certain provisions regarding use of cash collateral in the Project Account and HPI's Operating Account; and (iv) for lift of the automatic stay to permit HPI to post its Collateral for foreclosure and take possession of the HPI Operating Account except for certain reserves.

### D. Acceptance and Confirmation of the Plan

1. **Requirements for Confirmation.** At the Confirmation Hearing, the Court will determine whether the provisions of section 1129 of the Code have been satisfied. Section 1129 of the Bankruptcy Code, as applicable here, provides as follows:

The Plan must comply with the applicable provisions of the Code, including section 1123 which specifies the mandatory contents of a plan and section 1122 which requires that Claims and Interests be placed in Classes with "substantially similar" Claims and Interests (section 1129(a)(1)).

The Plan Proponent of the Plan must comply with the applicable provisions of the Code (section 1129(a)(2)).

The Plan must have been proposed in good faith and not by any means forbidden by law (section 1129(a)(3)).

Any payment made or to be made by the Debtors, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Case, or in connection with the Plan and incident to the Case, must be disclosed to the Court and approved or be subject to the approval of the Court as reasonable (section 1129(a)(4)).

The Debtors must disclose the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the reorganized debtor, of an affiliate of the Debtors participating in the Plan with the Debtors, or of a successor to the Debtors under the Plan. The appointment to, or continuance in, such office of such individual must be consistent with the interests of the Debtors' creditors, equity holders, and with public policy. The Plan Proponent must also disclose the identity of any insider that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider (section 1129(a)(5)). None of the former officers and/or directors of the Debtors will be retained under the Plan. There will be no compensation under the Plan paid to any former officer, director or insider of any of the Debtors.

The Plan must meet the "best interest of creditors" test which requires that each holder of a Claim or Interest of a Class of Claims or Interests that is impaired under the Plan either accept the Plan or receive or retain under the Plan on account of such Claim or Interest property of a value as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Code. If the holders of a Class of Secured Claims make an election under section 1111(b) of the Code, each holder of a Claim in such electing Class must receive or retain under the Plan on account of its Claim property of a value, as of the Effective Date of the Plan, that is not less than the value of its interest in the Debtor's interest in the property that secures its Claim (section 1129(a)(7)). To calculate what non-accepting holders would receive if the Debtor was liquidated under Chapter 7, the Court must determine the dollar amount that would be generated upon disposition of the Debtor's assets and reduce such amount by the costs of liquidation. Such costs would include the fees of a Trustee (as well as those of counsel and other professionals) and all expenses of sale.

Each Class of Claims or Interests must either accept the Plan or not be impaired under the Plan (section 1129(a)(8)). Alternatively, as discussed herein, the Plan may be confirmed over the dissent of a Class of Claims or Interests if the "cramdown" requirements of section 1129(b) of the Code are met.

Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan must provide that holders of Administrative Claims and Priority Claims (other than tax claims) will be paid in full in cash on the Effective Date of the Plan, and that holders of priority tax Claims will receive on account of such Claims deferred cash payments, over a period not exceeding six (6) years after the date of assessment of such tax, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claim (section 1129(a)(9)).

At least one impaired Class must accept the Plan, determined without including the acceptance of the Plan by any insider holding a Claim of such Class (section 1129(a)(10)).

The Plan must be "feasible". In other words, it cannot be likely that confirmation of the Plan will be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation is proposed in the Plan (section 1129(a)(11)).

All fees required to be paid under the Code have been paid or the Plan provides for such payment on its Effective Date (section 1129(a)(12)).

2. **The Plan Meets All of the Requirements for Confirmation.** The Plan Proponent believes that the Plan satisfies all statutory requirements of Chapter 11 of the Code and should be confirmed. More specifically:

(i) The Plan complies with all of the applicable provisions of the Code;

(ii) The Plan Proponent has complied with the Code and has proposed the Plan in good faith;

(iii) All disclosure requirements concerning payments made or to be made for services rendered in connection with the Chapter 11 case or the Plan have been, or will be met prior to or at the Confirmation Hearing; and

(iv) Administrative Claims, Priority Claims, and fees required to be paid under the Code are appropriately treated under the Plan.

## ARTICLE VII
## LIQUIDATION ANALYSIS

The Plan Proponent believes that the Plan affords creditors the potential for the greatest realization from the Debtors' assets, and, therefore, is in the best interests of creditors. The Plan Proponent has considered alternatives to the Plan, such as the Debtors' alternative Chapter 11 plan and a liquidation of the Debtors' assets in a Chapter 7 case. The Plan Proponent does not believe that the Debtors' plan or any alternative Chapter 11 plan would afford the holders of Claims a return as great as is proposed by HPI in the Plan. Given the Court's prior findings of fact and conclusions of law that the Debtors have no equity in their assets, HPI's secured claim as supported by the credible evidence creditors could realistically expect to receive zero recovery in any scenario other than the Plan. FEI Shale suggests that the alternative of a sale of the Debtors' assets should be considered. The Court previously accepted the Debtors' going concern valuation of their assets in the $28.1 - $38.2 million range. Any sale, particularly a "fire sale" value of those assets would be significantly less and any proceeds would be completely consumed by HPI's secured claims.

The same is true in a Chapter 7 liquidation scenario. Generally, under Chapter 7, a trustee would be appointed to administer the Estate, to resolve pending controversies against the Debtors and claims of the Estates against other parties, and to make distribution to Creditors. If the Cases were converted to cases under Chapter 7, significant additional Administrative Expenses would be incurred. Any distributions to holders of Claims would be substantially delayed and, in all likelihood, reduced as compared to the anticipated results of Confirmation of the Plan. A Chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in § 326 of the Bankruptcy Code. A Chapter 7 trustee might also seek to retain new professionals, including attorneys and accountants, in order to resolve any disputed Claims and possibly to pursue claims of the Estates against other parties. There is a strong probability that such Chapter 7 trustee would not possess any particular knowledge of the oil and gas industry. The trustee and any such new professionals retained by the trustee would need to expend time familiarizing themselves with the properties owned by the Debtors and the industry generally, resulting in a duplication of effort, increased expense, and delay in payment to Creditors. Under the Bankruptcy Rules, a new bar date for the filing of proofs of claim would have to be set, and additional Claims against the Estates that will soon be time-barred (because they were not filed before the applicable bar dates set in the Cases) could be asserted.

Further, however, specifically in this case, the more compelling and direct reason that the HPI Plan is preferable to a Chapter 7 liquidation is simple and straightforward; the Debtors, separately Debtor by Debtor and collectively as a group, are hopelessly insolvent. *The Debtors' liabilities to HPI alone far exceed the value of their assets and, in a Chapter 7 "straight liquidation" scenario, the unsecured creditors of these estates would receive nothing*. Two of the Debtors have no assets other than their equity interests in one of the other Debtors (Hallwood Energy Management, LLC, HG II Management, LLC); and one Debtor seemingly has no assets at all (Hallwood SWD, LLC). As for the other two "smaller" Debtors, one has assets allegedly of approximately $15 million and secured debt owed to HPI of in excess of $118 million (Hallwood Gathering, LP); and one has assets allegedly of approximately $2 million and secured debt owed to HPI of in excess of $118 million (Hallwood Petroleum, LLC). Finally, as for Hallwood Energy, the "lead" Debtor as it were, Hallwood Energy generously has assets allegedly of approximately $40 million (HPI's Collateral only) and secured debt to HPI of in excess of $118 million. On a Debtor by Debtor basis or on a consolidated basis, each Debtor and the collective Debtors are insolvent and lack any equity in their assets. FEI Shale objects that this liquidation analysis is insufficient. HPI disagrees. In the Court's findings of fact an conclusions of law attached hereto as Exhibit "B," the Court clearly and specifically found that the Debtors have no equity in their property, that the property has a value of between $28.1 million and $38.2 million according to the Debtors, and that credible evidence showed that HPI is owed more than $118 million. Given these express findings by the Bankruptcy Court, the numbers speak for themselves. The liquidation analysis here is simple and the contrast to the scenario under the Plan is stark. In a straight liquidation, unsecured creditors will receive nothing. Under the Plan, the unsecured creditors have the potential to share in recoveries on the Causes of Action. The Plan thus affords creditors the potential for the greatest (and only) realization from the Debtors' assets, and, therefore, is in the best interests of creditors.

THE PLAN PROPONENT BELIEVES THAT CONFIRMATION AND IMPLEMENTATION OF THE PLAN IS PREFERABLE TO ANY OF THE ALTERNATIVES DESCRIBED HEREIN BECAUSE IT SHOULD PROVIDE GREATER RECOVERIES THAN THOSE AVAILABLE IN A CHAPTER 7 LIQUIDATION TO THE HOLDERS OF SECURED AND UNSECURED CLAIMS WHO WOULD LIKELY RECEIVE LESS IN A CHAPTER 7 LIQUIDATION. IN ADDITION, OTHER ALTERNATIVES WOULD INVOLVE DELAY, UNCERTAINTY, AND SUBSTANTIAL ADMINISTRATIVE COSTS.

## ARTICLE VIII

## VOTING PROCEDURES

ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DETERMINED, PURSUANT TO THE BANKRUPTCY CODE, BASED UPON THE ALLOWED CLAIMS AND ALLOWED INTERESTS THAT ACTUALLY VOTE ON THE PLAN. THEREFORE, IT IS IMPORTANT THAT CLAIMANTS EXERCISE THEIR RIGHT TO VOTE TO ACCEPT OR REJECT THE PLAN.

### A. Classes Entitled to Vote on the Plan

All members of Impaired Classes who hold Allowed Claims are entitled to vote to accept or reject the Plan. Section 1124 of the Bankruptcy Code generally provides that a class of claims or interests is considered to be Impaired under a plan unless the plan does not alter the legal, equitable and contractual rights of the holders of such claims or interest. For purposes of Plan solicitation, all Classes of Claims are Impaired and are, therefore, entitled to cast ballots on this Plan. Interest holders are deemed to have rejected the Plan and are therefore not entitled to vote on the Plan.

### B. Persons Entitled to Vote on the Plan

Only holders of Allowed Claims and holders of Disputed Claims which have been temporarily allowed for voting purposes are entitled to vote on the Plan. For purposes of the Plan, an Allowed Claim is (i) a Claim against or Interest in a Debtor, proof of which, if filed on or before the Bar Date, which is not a Contested Claim or Contested Interest, (ii) if no proof of claim or interest was so filed, a Claim against or Interest in a Debtor that has been or hereafter is listed by a Debtor in the Schedules as liquidated in amount and not disputed or contingent, or (iii) a Claim or Interest allowed hereunder or by Final Order. An Allowed Claim or Allowed Interest does not include any Claim or Interest or portion thereof which is a Disallowed Claim or Disallowed Interest which has been subsequently withdrawn, disallowed, released or waived by the holder thereof, by this Plan, or pursuant to Final Order. Unless otherwise specifically provided in the Plan, an Allowed Claim or Allowed Interest shall not include any amount for punitive damages or penalties. Therefore, although the holders of Disputed Claims will receive ballots, these votes will not be counted unless such Claims become Allowed Claims as provided under the Plan or are temporarily allowed for voting purposes by the Court.

**THE CLAIMS IN ALL CLASSES UNDER THE PLAN ARE IMPAIRED AND ARE ENTITLED TO VOTE WITH RESPECT TO ACCEPTANCE OR REJECTION OF THE PLAN.**

### C. Vote Required for Class Acceptance

During the Confirmation Hearing, the Bankruptcy Court will determine whether the Classes voting on the Plan have accepted the Plan by determining whether sufficient acceptances have been received from the holders of Allowed Claims actually voting in such Classes. A Class of Claims will be determined to have accepted the Plan if the holders of Allowed Claims in the Class casting votes in favor of the Plan (i) hold at least two-thirds of the total amount of the Allowed Claims of the holders in such Class who actually vote and (ii) constitute more than one-half in number of holders of the Allowed Claims in such Class who actually vote on the Plan.

As a condition to Confirmation, the Bankruptcy Code requires that each impaired Class of Claims or Interests accept the Plan, subject to the "cramdown" exception of §1129(b) described herein. To effectuate the §1129(b) exception, at least one impaired Class of Claims must accept the Plan.

### D. Voting Instructions

1.  **Ballots and Voting.** Holders of Allowed Claims entitled to vote on the Plan have been sent a Ballot, together with instructions for voting, with this Disclosure Statement. Claimants should read the Ballot carefully and follow the instructions contained therein. In voting for or against the Plan, please use only the Ballot that accompanies this Disclosure Statement.

**EACH CREDITOR WILL RECEIVE A SINGLE BALLOT ONLY. IF YOU HAVE MORE THAN ONE CLAIM AGAINST ONE OF THE DEBTORS, OR YOU HAVE CLAIMS AGAINST MORE THAN ONE DEBTOR, YOU MAY REPRODUCE THIS BALLOT AS MANY TIMES AS NECESSARY TO PROPERLY VOTE YOUR CLAIMS. IF YOU HAVE ANY QUESTIONS CONCERNING THE BALLOT OR VOTING PROCEDURES, YOU SHOULD CONTACT COUNSEL FOR THE DEBTORS:**

C. ASHLEY ELLIS<br>
WRIGHT GINSBERG BRUSILOW P.C<br>
600 SIGNATURE PLACE<br>
14755 PRESTON ROAD<br>
DALLAS, TEXAS 75254<br>
(972) 788-1600<br>
aellis@wgblawfirm.com

2.  **Returning Ballots and Voting Deadline.** You should complete and sign each Ballot that you receive and return it in the pre-addressed envelope enclosed with each Ballot to the counsel for the Debtor in the self-addressed envelope provided, by the Voting Deadline.

THE VOTING DEADLINE IS 4:00 P.M., CENTRAL STANDARD TIME, ON SEPTEMBER 30, 2009. IN ORDER TO BE COUNTED, BALLOTS MUST BE ACTUALLY RECEIVED BY COUNSEL FOR THE DEBTOR ON OR BEFORE 4:00 P.M., CENTRAL STANDARD TIME, ON THE VOTING DEADLINE AT THE ADDRESS SET FORTH IN THE BALLOT INSTRUCTIONS WHICH ACCOMPANY THE ENCLOSED BALLOT. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE VOTING DEADLINE MAY NOT BE ACCEPTED OR USED IN CONNECTION WITH THE PLAN PROPONENT'S REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.

3. **Incomplete or Irregular Ballots.** Ballots which fail to designate the Class to which they apply shall be counted in the appropriate Class as determined by the Plan Proponent, subject only to contrary determinations by the Bankruptcy Court.

4. **Changing Votes.** Bankruptcy Rule 3018(a) permits a Claimant, for cause, to move the Bankruptcy Court to permit such claimant to change or withdraw its acceptance or rejection of a plan of reorganization.

### E. Contested and Unliquidated Claims

Contested Claims are not entitled to vote to accept or reject the Plan. If you are the holder of a Contested Claim, you may ask the Bankruptcy Court pursuant to Bankruptcy Rule 3018 to have your Claim temporarily Allowed for the purpose of voting.

### F. Possible Reclassification of Creditors and Interest Holders

The Plan Proponent is required pursuant to §1122 of the Bankruptcy Code to place Claims and Interests into Classes that contain substantially similar Claims or Interests. While the Plan Proponent believes that all Claims and Interests are classified in the Plan in compliance with §1122, it is possible that a Claimant or Interest holder may challenge the classification of its Claim or Interest. If the Plan Proponent is required to reclassify any Claims or Interests of any Claimants or Interest holders under the Plan, the Plan Proponent, to the extent permitted by the Bankruptcy Court, intends to continue to use the acceptances received from such Claimants or Interest holders pursuant to the solicitation of acceptances using this Disclosure Statement for the purpose of obtaining the approval of the Class or Classes of which such Claimants or Interest holders are ultimately deemed to be a member. Any reclassification of Claimants or Interest holders should affect the Class in which such Claimants or Interest holders were initially a member, or any other Class under the Plan, by changing the composition of such Class and the required vote thereof for approval of the Plan.

# ARTICLE IX

## CRAMDOWN OR MODIFICATION OF THE PLAN

### A. "Cramdown:" Request for Relief under Section 1129(b)

In the event any Impaired Class of Claims shall fail to accept the Plan in accordance with § 1129(a) of the Bankruptcy Code, the Plan Proponent shall request the Bankruptcy Court to confirm the Plan in accordance with the provisions of § 1129(b) of the Bankruptcy Code.

The Court may confirm a plan, even if it is not accepted by all impaired Classes, if a plan has been accepted by at least one impaired Class of Claims and the plan meets the "cramdown" provisions set forth in § 1129(b) of the Code. The "cramdown" provisions require that the Court find that a plan "does not discriminate unfairly" and is "fair and equitable" with respect to each non-accepting impaired Class. In the event that all impaired Classes do not vote to accept the Plan, the Plan Proponent will request that the Bankruptcy Court nonetheless confirm the Plan pursuant to the provisions of § 1129(b) of the Code.

The Court may find that the Plan is "fair and equitable" with respect to a Class of non-accepting impaired Interests only if (a) the holder of an Interest will receive or retain under the Plan property of a value as of the Plan's Effective Date equal to the greatest of any fixed liquidation preference or redemption price or the value of such Interest or (b) the holder of any Interest that is junior to such Interest will not receive or retain any property under the Plan.

The Court may find that the Plan is "fair and equitable" with respect to a Class of non-accepting impaired Unsecured Claims only if (a) each impaired unsecured Creditor receives or retains under the Plan property of a value as of the Effective Date of such Plan equal to the amount of its Allowed Claim, or (b) the holder of any Claim or Interest that is junior to the Claims of the dissenting Class will not receive or retain any property under the Plan.

The Court may find that the Plan is "fair and equitable" with respect to a Class of non-accepting Secured Claims, only if, under the Plan, (a) the holder of each Secured Claim in such Class retains such holder's lien and receives deferred cash payments totaling at least the Allowed amount of such Secured Claim and having a value, as of the Effective Date of the Plan, equal to or in excess of the value of such holder's interest in the estate's interest in the collateral for the Secured Claim, (b) the collateral for such Secured Claim is sold, the lien securing such Claims attached to the proceeds, and such liens on proceeds are afforded the treatment described under clause (a) or (c) of this sentence, or (c) the holders of such Secured Claims realize the "indubitable equivalent" of their claims.

If all of the provisions of section 1129 are met, the Court may enter an order confirming the Plan.

### B. The Plan Meets the "Best Interest of Creditors" Test

The "best interest of creditors" test requires that the Court find that the Plan provides to each non-accepting holder of a Claim or Interest treated under the Plan a recovery which has a present value at least equal to the present value of the distribution that such person would receive from the Debtor if the Debtor were liquidated under Chapter 7 of the Code. An analysis of the likely recoveries and affect on Creditors in the event of liquidation under Chapter 7 of the Code is contained hereinabove.

### C. The Plan is Feasible

The Code requires that, as a condition to Confirmation of a plan, the Court find that Confirmation is not likely to be followed by a liquidation or a need for further financial reorganization except as proposed in that plan. Initially, the Plan provides the mechanism by which the Trusts will pay all Allowed Priority Claims, Administrative Claims, Fee Claims, Administrative Tax Claims, and Administrative Convenience Claims: the Trust will be funded by the Net Proceeds and Recoveries from the Trust Assets being (i) the balance of any monies in the Project Account; (ii) the Causes of Action; and (iii) the Trust Shares. Other than confirmation of the Plan itself, there is no contingency that must be satisfied for the Trusts to be formed and the Trust Assets transferred into it.

The Net Proceeds and Net Recoveries from the Causes of Action will be used to satisfy the Allowed Claims of all Unsecured Creditors in accordance with the terms of the Plan as proposed and the priority scheme set forth in the Code. HPI cannot predict with certainty the Recoveries on any particular Cause of Action or whether Recoveries will be sufficient to pay all creditors of these Debtors in full or provide a significant return to them. However, HPI asserts that there is no value in the Debtors' estates over and above the HPI Senior Secured Claim whether HPI's Plan is confirmed or not. The fact that the Debtors liabilities greatly exceed their assets is just that, a fact. Under HPI's Plan, Creditors are not asked to pin their hopes for payment on future business achievements or successes of these Debtors which, given the Debtors' historical losses would be unrealistic. Creditors are not asked to rely on an infusion of capital from some unidentified source, or any other visionary scheme from these Debtors who have already lost over $550 million. Under the HPI Plan, the Trust will be funded and Creditors holding Allowed Unsecured Claims will be paid from the Net Proceeds and Recoveries of the Trust activities; the Plan is feasible.

### D. The Plan Meets the Cramdown Standard With Respect to Any Impaired Class of Claims Rejecting the Plan

The Plan satisfies the provisions for cramdown under §1129(b)(2) of the Code. Secured Creditors are retaining their liens and receiving the value of their interest in the Debtors' property totaling the allowed amount of their Secured Claims. Interest Holders are not receiving or retaining any property under the Plan on account of their Interests unless and until all senior Creditors are paid in full. In the event an impaired Class rejects the Plan, the Plan shall be deemed a motion for cramdown of such Class under §1129(b)(2) of the Code.

### E. Modification or Revocation of the Plan; Severability

Subject to the restrictions on modifications set forth in §1127 of the Bankruptcy Code and any applicable notice requirements, the Plan Proponent reserves the right to alter, amend or modify the Plan before its substantial consummation. The Plan Proponent also reserves the right to withdraw the Plan prior to the Confirmation Date. If the Plan Proponent withdraws the Plan, or if Confirmation does not occur, then the Plan shall be null and void in all respects, and nothing contained in the Plan will: (1) constitute a waiver or release of any Claims or rights against, or any Interest in, the Debtors by HPI; or (2) prejudice in any manner the rights of HPI.

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court, at the request of the Plan Proponent, has the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

## ARTICLE X

## RISK FACTORS

### A. Factors Relating to Chapter 11 and the Plan

The following is intended as a summary of certain risks associated with the Plan, but is not exhaustive and must be supplemented by the analysis and evaluation of the Plan and this Disclosure Statement made by each Claimant as a whole in consultation with such Claimant's own advisors. It is unlikely, although possible, that there may be no appreciable Net Recoveries from the Causes of Action transferred to the Trust. The fact remains, however, that the Debtors are hopelessly insolvent; in order for Creditors to be paid, one or more of the Causes of Action must be pursued. This risk, however, is not exclusive to the Plan. The value of the Debtors' estates over and above the Secured Claims against these estates is tied to the Causes of Action whether the Plan is confirmed or not. HPI believes that the Plan is feasible, and the risk that no Recoveries will be realized will be minimal.

### B. Insufficient Acceptances

The Plan may not be confirmed without sufficient accepting votes. Each impaired Class of Claims and Interests receiving a distribution under the Plan is given the opportunity to vote to accept or reject the Plan. The Plan will be accepted by a Class of impaired Claims if the Plan is accepted by Claimants in such Class actually voting on the Plan who hold *at least* two-thirds (2/3) in amount and *more than* one-half (½) in number of the total Allowed Claims of that Class which actually vote. The Plan will be accepted by a Class of impaired Interests if it is accepted by holders of Interests in such Class actually voting on the Plan who hold *at least* two-thirds (2/3) in amount of the total

Allowed Interests of the Class which actually vote. However, an Interest Holder is deemed to have rejected the Plan and is therefore not entitled to vote on the Plan. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.

If any impaired Class of Claims under the Plan fails to provide acceptance levels sufficient to meet the minimum Class vote requirements but at least one impaired Class of Claims accepts the Plan, then, subject to the provisions of the Plan, HPI intends to request confirmation of the Plan under Section 1129(b) of the Bankruptcy Code.

### C. Lack of Material Recoveries on the Causes of Action

Hallwood Group has objected to the Disclosure Statement on the basis that the risks of the Plan are not disclosed. Discussions of the risks inherent in the Plan appear throughout this Disclosure Statement, however, in an effort to respond to Hallwood Group's concerns, they are concisely repeated here in this section. There is a risk that the litigation intended to be brought under the Plan will not yield any material Net Proceeds for the payment of creditors. Risk is an inescapable part of any litigation. HPI firmly believes that the Causes of Action against the former officers and directors of the Debtors and the Causes of Action against Hallwood Group have merit and significant value. The Notice of Claim sent to the Debtors' D&O insurance company and the litigation already commenced in state court against several of the Debtors' former officers and directors are each attached to this Disclosure Statement so that creditors may also evaluate those claims as they determine whether to vote to accept the Plan. HPI cannot guarantee that the Net Proceeds from the Causes of Action will exceed a certain amount, or even guarantee recovery at all; it is nonsensical to think that HPI could. However, HPI believes that if the Causes of Action against the Debtors former officers and directors and Hallwood Group proceeds, the risk of zero dollars in Net Proceeds is very low. If the litigation is not brought at all, the risk of zero dollars in Net Proceeds is 100%. Without funding, the litigation cannot be pursued. HPI has agreed to fund the Causes of Action as set forth in the Plan, and unsecured creditors will share in the recoveries from that litigation.

## ARTICLE XI

## CERTAIN FEDERAL INCOME TAX
## CONSEQUENCES OF THE PLAN

The following discussion summarizes certain possible federal income tax consequences of the Plan to the Debtors, and to the holders of Claims and Interests. It is based on the Internal Revenue Code of 1986, as amended (the "Code"), Treasury Regulations, and administrative and judicial interpretations thereof which are now in effect, but which could change, even retroactively, at any time. This discussion does not address all aspects of federal, state and local tax laws that could impact the various classes of Claimants, the holders of Interests or the Debtors.

**NO RULING HAS BEEN SOUGHT OR OBTAINED FROM THE IRS WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OBTAINED BY THE PLAN PROPONENT WITH RESPECT THERETO. NO REPRESENTATIONS OR ASSURANCES ARE BEING MADE WITH**

RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN. CERTAIN TYPES OF CLAIMANTS AND INTEREST HOLDERS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES. FURTHER, STATE, LOCAL, OR FOREIGN TAX CONSIDERATIONS MAY APPLY TO A HOLDER OF A CLAIM OR INTEREST WHICH ARE NOT ADDRESSED HEREIN. BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH HOLDER OF A CLAIM OR INTEREST AFFECTED BY THE PLAN MUST CONSULT, AND RELY UPON, HIS OR HER OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF THE PLAN WITH RESPECT TO THAT HOLDER'S CLAIM OR INTEREST. THIS INFORMATION MAY NOT BE USED OR QUOTED IN WHOLE OR IN PART IN CONNECTION WITH THE OFFERING FOR SALE OF SECURITIES.

**11.1  Tax Consequences to the Debtors**. Under the IRC, a taxpayer generally must include in gross income the amount of any discharge of indebtedness income realized during the taxable year. Section 108(a)(1)(A) of the IRC provides an exception to this general rule, however, in the case of a taxpayer that is under the jurisdiction of a bankruptcy court in a case brought under the Bankruptcy Code where the discharge of indebtedness is granted by the court or is pursuant to a Plan approved by the court, provided that the amount of discharged indebtedness that would otherwise be required to be included in income is applied to reduce certain tax attributes of the taxpayer. Section 108(e)(2) of the IRC provides that a taxpayer shall not realize income from the discharge of indebtedness to the extent that satisfaction of the liability would have given rise to a deduction. As a result of §§ 108(a)(1)(A) and 108(e)(2) of the IRC, the Debtors do not anticipate that any of them will recognize any taxable income from the discharge of indebtedness through the Chapter 11 Cases. Reductions in tax attributes (net operating loss carryover) will occur to the extent of cancellation of indebtedness income not recognized due to the above.

Under § 1141 of the Bankruptcy Code, confirmation of the Plan will discharge the Debtors from all debts except as provided for in the Plan. Implementation of the Plan, including the liquidation and ultimate dissolution of the Debtors may result in discharge of indebtedness to the Debtors as a matter of tax law to the extent of any unsatisfied portion of such Claims. Any such discharge of indebtedness should not be included in gross income of the Debtor, however, because of the exceptions to such inclusion discussed above.

**11.2  Tax Consequences to Creditors**. A Creditor who receives cash or other consideration in satisfaction of any Claim may recognize ordinary income. The impact of such ordinary income, as well as the tax year for which the income shall be recognized, shall depend upon the individual circumstances of each Claimant, including the nature and manner of organization of the Claimant, the applicable tax bracket for the Claimant, and the taxable year of the Claimant. Each Creditor is urged to consult with its tax advisor regarding the tax implications of any payments or distributions under the Plan.

In general, the principal federal income tax consequences of the Plan to holders of Claims will be (a) recognition of loss or a bad debt deduction to the extent that the total payments received under the Plan with respect to the Claim are less than the adjusted basis of the holder in such Claim, or (b) recognition of taxable income by the holder of the Claim to the extent of the excess of the amount of any payments made under the Plan in respect of the Claim over the holder's adjusted basis therein.

Common examples of holders of Claims who may recognize taxable income upon receipt of payments under the Plan include (a) former employees with Claims for services rendered while serving as employees of a Debtor, (b) trade creditors whose Claims represent an item not previously reported in income (including Claims for lost income upon rejection of leases or other contracts with a Debtor), (c) holders of Claims who had previously claimed a bad debt deduction with respect to their Claims in excess of their ultimate economic loss, and (d) holders of Claims that include amounts of pre-petition interest that had not previously been reported in income. Common examples of Claims who may recognize a loss or deduction for tax purposes as a result of implementation of the Plan, provided that such holders are not paid in full, include holders of Claims that arose out of cash actually loaned or advanced to a Debtor, and holders of Claims consisting of items that were previously included in income of such holders on the accrual method of accounting, to the extent, in both cases, that the economic loss to such holders has not been allowed as a tax deduction in a prior year.

The amount and character or any resulting income or loss recognized for federal income tax consequences to a holder of any Claim as a result of implementation of the Plan will, however, depend on many factors. The most significant of these factors include (a) the nature and origin of the Claim, (b) whether the holder is a corporation (c) the extent to which the Plan provides for payment of the particular Claim, (d) the extent to which any payment made is allocable to pre-petition interest which is part of such Claim, and (e) the prior tax reporting positions taken by the holder with respect to the item that constitutes the Claim. As to the last factor, relevant tax reporting positions include whether the holder had to report under its method of accounting any portion of the Claim (including accrued and unpaid interest) as income prior to receipt and whether the holder previously claimed a bad debt or worthlessness deduction with respect to the Claim, which would affect the adjusted basis of the holder in the Claim.

General rules for the deduction of bad debts are provided in IRC § 166 as follows:

If either (a) the creditor is a corporation, or (b) the debt is a business bad debt in the hands of the creditor, and the creditor demonstrates that the debt is collectable only in part, a deduction for partial worthlessness of the debt will be allowed to the extent that the debt is charged off in the accounting records of the creditor.

For a creditor not described in the previous paragraph, a bad debt deduction is allowable only in the year that the debt becomes wholly worthless.

If the creditor is not a corporation and the debt is a nonbusiness bad debt, the bad debt deduction is treated as a short-term capital loss, which can offset only capital gain income and a limited amount of ordinary income.

For purposes of IRC § 166, a "nonbusiness debt" means a debt other than (i) a debt created or acquired in connection with the creditor's trade or business, or (ii) a debt the loss from the worthlessness of which was incurred during the operation of the creditor's trade or business.

The time as of which a debt becomes worthless (or partially worthless), and therefore the tax year in which a creditor may claim a bad debt deduction, is a question of fact. Pursuant to Income Tax Regulations ("Regs.") § 1.166-2(c), as a general rule, bankruptcy is an indication of the worthlessness of at least a part of an unsecured, non-priority debt. In bankruptcy cases, a debt may become worthless before settlement in some instances, and only when a settlement in bankruptcy has been reached in other instances. The mere fact that bankruptcy proceedings instituted against the debtor are terminated in a later year, thereby confirming the conclusion that the debt is worthless (or partially worthless), does not necessarily shift the deduction to such later year. Thus, even though the precise amount that holders of General Unsecured Claims or other Claims will receive under the Plan may not be known until the final distribution date, the determination of the precise amount that will be paid under the Plan with respect to a Claim, or that no amount will be paid, does not necessarily establish that any resulting bad debt deduction is properly allowable in the Creditor's tax year in which the final distribution is made, rather than in an earlier year. Accordingly, to the extent that a Creditor may claim a bad debt deduction which it has not previously claimed, it is possible that the Creditor will be required to amend its return for a prior year and claim the deduction in that year, rather than in the year in which the final distribution is made. Creditors should consult with their individual tax advisors with respect to this issue.

The extent to which gain or loss may be recognized by a holder of a Claim upon implementation of the Plan may be significantly affected by any bad debt deduction that may have been claimed by the holder in a prior year with respect to the debt on which the Claim is based. If the holder took a bad debt deduction in a prior year which is recovered in whole or part through a payment made to the holder pursuant to the Plan, the holder will generally be required to include in income the amount recovered in the year the holder receives the payment. An exception to this rule permits exclusion of a recovery of a prior bad debt deduction to the extent that the earlier bad debt deduction did not produce a tax benefit to the holder.

THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR CONSULTATION WITH A TAX ADVISOR. THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES MAY ALSO VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OR HER OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

## ARTICLE XII

### RECOMMENDATION OF THE PLAN PROPONENT

The Plan Proponent believes the Plan is in the best interests of all Creditors. Accordingly, the Plan Proponent recommends that you vote for acceptance of the Plan and hereby solicits your acceptance of the Plan. **THE COMMITTEE ALSO SUPPORTS THE PLAN AND RECOMMENDS YOU VOTE IN FAVOR OF THE PLAN.**

DATED: August 27, 2009

                                                        **HALL PHOENIX/INWOOD, LTD.**

                                                        By: Phoenix Inwood Corporation

                                                        By:   */s/ Donald Braun*
                                                                 Donald Braun, President

FRANK J. WRIGHT
PAUL B. GEILICH
C. ASHLEY ELLIS
WRIGHT GINSBERG BRUSILOW P.C.
14755 PRESTON ROAD
SUITE 600
DALLAS, TX 75254
(972) 788-1600
(972) 239-0138 - FAX

ATTORNEYS FOR HALL PHOENIX/INWOOD, LTD.

I:\7200s\7221\Hallwood Energy\Plan\HPI Disclosure Statement - first amended.wpd